SOL BLOCK & GRIFF, A Copartnership Composed of SOL BLOCK and THEO. W. GRIFF, Respondent, v. SAMUEL L. SCHWARTZ, Respondent; JOHN MANN, Intervener and Appellant.

No. 1521.   (76 Pac. 22.)

1. **Fraudulent Sales: Merchandise: Sales in Bulk: Restrictions: Statutes: Constitutional Law.**
   A state statute, as to any subject within the State's jurisdiction on which the Constitutions of the State and of the United States are silent will not be declared invalid on the ground that it is unwise, or opposed to justice and equity.

2. **Same: Freedom of Contract.**

The term "liberty," as used in the constitutional guaranty that no person shall be deprived of life, "liberty," or property without due process of law, is not restricted to mere freedom from imprisonment, but embraces religious, civil, political, and personal rights, including the right of each citizen to purchase, hold, and sell property· in the same manner and to the same extent as every other citizen.

3. **Same: Deprivation of Property: Session Laws, 1901. chap. 67, page 67, Unconstitutional.**

Act March 14, 1901, page 67, chapter 67, provides that a sale of any portion of a stock of merchandise out of the ordinary course of trade, or a sale of an entire stock in bulk, is fraudulent and void as against creditors of the seller unless an inventory as prescribed is made five days before the sale, and all the creditors of the seller of which the purchaser has or may obtain knowledge by reasonable diligence shall have been notified thereof; and section 2 (page 68) makes the violation of the previous section a misdemeanor. *Held*, that such act was unconstitutional, as depriving a merchant owing debts of his liberty to contract, amounting to a deprivation of property without due process of law.

4. **Same: Police Power.**

Such act was not sustainable as within the State's police power.

5. **Same: Class Legislation.**

Since such act does not apply to sales of the same character by merchants not owing debts, but applies to and renders criminal the same sales by merchants who are debtors and by persons in a fiduciary capacity failing to comply with its terms, the act is unconstitutional, as class legislation.

(Decided March 22, 1904.)

Appeal from the Third District Court, Salt Lake County.—*Hon. C. W. Morse,* Judge.

Action to recover the price of goods sold. The opinion states the facts. From a justice's judgment in favor of intervener, reversed on appeal to the District Court, the intervener appealed.

REVERSED.

*Messrs. Zane & Stringfellow* for appellant.

So that chapter 67, Sess. Laws, 1901, is violative of the following recognized inherent right:

(1)    Deprives man of his liberty.

(2)    Deprives one of the right to acquire and possess property.

(3)    Deprives one of the right to dispose of his property.

(4)    Takes from one his property without due process of law.

(5)    Subjects one to unreasonable searches into his private business, papers and effects.

(6)    It is class legislation operating only upon particular individuals of the body politic, namely, those in debt.

In conclusion we submit the following propositions of law and authorities.

1.    The constitutional rights of the citizen to life, liberty and property are wholly unlimited and unrestricted, except by .considerations of the public good; and no abridgment or deprivation of the rights by the legislature will be upheld or enforced except as a regulation of police power operating to the benefit of all individuals of the community equally.    People v. Gillson, 109 N. Y. 389; In re Jacobs, 98 N. Y. 98; Watertown v. Mayo, 109 Mass. 315; State v. Looms, 115 Mo. 307 (22 S. W. 350); State v. Julon, 129 Mo. 163 (31 S. W. 781); Millit v. People, 117 Ill. 294 (7 N. E. 631); State v. Goodwill, 33 W. Va. 179 (10 S. E. 285); Lawton v. State, 152 U. S. 133; Exparte v. Whitwell, 32 Pac. 870 (Cal.); In Butchers' Union Co. v. Crescent City Co., 111 U. S. 746; In Berthoff v. O'Relly, 74 N. Y. 509, 515.

2.    The law will not allow rights of property to be invaded under the pretense of prescribing a police regulation; the State can not be permitted to encroach upon the just right secured by the Constitution against

abridgment. In re Jacobs, 98 N. Y. 98, 110; Commonwealth v. Alger, 7 Cush. 53, 84; Austin v. Murry, 16 Pick. 121, 126; Watertown v. Mayo, 109 Mass. 315, 319; Slaughter-house cases, 16 Wall. 35, 87; Coe v. Schultz, 47 Barb. 64; Town of Lake View v. Rose Hill Co., 70 Ill. 191; Stuart v. Palmer, 74 N. Y. 103; Rockwell v. Nearing, 35 N. Y. 302; Matter of Townsend, 29 N. Y. 569; Matter of Eureka Basin Warehouse and Manufacturing Co., 96 N. Y. 42; People v. Equitable Trust Co., 96 N. Y. 387; People v. Gillson, 109 N. Y. 389, 400.

3.   Where rights of property are admitted to exist the legislature can not say they shall exist no longer and to so contend would be to say that one's property may be taken without due process of law.   State v. Julon, 129 Mo. 163 (31 S. W. 781); Pumpelley v. Green Bay Co., 13 Wall. 166-67; In re Jacobs, 98 N. Y. 98; In Wynehamer v. People, 13 N. Y. 378; State v. Goodwill, 33 W. Va. 179 (10 S. E. 285).

4.   All men have a right to the secure enjoyment of property and to be protected in their houses, papers, and possessions against unreasonable searches and the sanctity of private business ought not to be invalid. City of Clinton v. Phillips, 58 Ill. 102 (11 Am. R. 52).

5.   "The rights of every individual must stand or fall by the same rule of law that governs every other member of the body politic."   State v. Goodwill, 33 W. Va. 179 (10 S. E. 285); Civil Rights Cases, 109 U. S. 23; People v. Gillson, 109 N. Y. 398 (17 N. E. 343); In Butchers' Union C. v. Crescent City, etc., 111 U. S. 755; Wally v. Kennedy, 2 Yerg. 554; Yick W. v. Hoopkins, 118 U. S. 356; In Millith v. People, 117 Ill. 294 (7 N. E. 631).

*W. R. Huthinson, Esq.*, for respondent plaintiff.

BARTCH, J.—This action was originally brought in a justice's court on April 2, 1902, to recover $277.47 for merchandise sold and delivered to the defendant

Schwartz.   On the same day, at the instance of the plaintiffs, the goods were attached while in the possession of the intervener, John Mann, to whom Schwartz had previously, on March 29, 1902, sold and delivered the same for the sum of $550, which was its fair value, the purchase having been made in good faith.   After the writ of attachment was levied upon the goods the purchaser filed his complaint in intervention, claiming to own all the property included in the levy, and praying that the attachment be dissolved, and the goods restored to his possession, and for damages and costs. Neither the seller nor the purchaser made an inventory of the merchandise before sale, as required by the act approved March 14, 1901, p. 67, c. 67, Sess. Laws Utah, nor did they in other respects comply with the requirements of that act.   The cause was first tried in the justice's court, where judgment was rendered in favor of the intervener, and then appealed to and tried in the district court, where the sale was held fraudulent and void under the statute referred to, and judgment rendered in favor of the plaintiffs.   The appeal to this court presents simply the question of the constitutionality of the law relating to the sale of merchandise in bulk, found in that enactment.

The appellant contends that the act is unconstitutional and void, and that, therefore, he can not be punished for a violation of its provisions.   He insists that it is repugnant to and in conflict with both Federal and State Constitutions, in that it abridges and interferes with the inherent and inalienable rights which are guaranteed to every subject by both Constitutions.   The respondent contends that the act is not in conflict with the supreme law, but is the result of a proper exercise, by the Legislature, of the police power of the State.   In determining the question thus presented it behooves us to be mindful of the fact that the enactment in controversy has, in the judgment of both the legislative and executive branches of the State government, been declared a valid exercise of legislative power.   Courts

will always approach such a judgment with that consideration and respect which is due to the co-ordinate branches of the government, and if, upon an examination and comparison of the enactment with the constitutional provisions which it is claimed to violate, there is a well-grounded doubt of its validity, such doubt must be resolved in favor of its constitutionality. If, however, notwithstanding the enactment was passed with all due deliberation and formalities, it be found to contravene constitutional provisions, or to constitute an infringement upon the rights of individuals guaranteed by the Constitution, then the courts have the conceded power to declare void the enactment, as being a violation of the supreme law of the land. But, although such power is lodged in the courts, they will not declare void a legislative enactment unless there is a substantial conflict between it and the Constitution; and so high a regard do the courts entertain for the judgment of the makers of the law that in determining the validity of an enactment every presumption will be indulged in favor of its constitutionality. The question of the validity of a legislative act can alone be determined by reference to the constitutional inhibitions and restraints. Whenever, as to any subject within the jurisdiction of the State, the Constitutions of the State and of the United States are silent, the Legislature may speak; and when it does speak its enactment will not be declared void simply because, in the opinion of the court, it is unwise, or opposed to justice and equity. The sole question in such case is whether the act violates the supreme law of the State or of the United States. If it does, it is the plain duty of the courts to declare its invalidity. The question under consideration must be determined in the light of these principles, which have been frequently asserted by the courts.

Section 1 of the act in controversy reads: "A sale of any portion of a stock of merchandise otherwise than in the ordinary course of trade, and in the regular and usual prosecution of the seller's business, or a sale of

an entire stock of merchandise in bulk, is fraudulent and void as against the creditors of. the seller, unless the seller and purchaser shall at least five days before the sale make a full and detailed inventory, showing the quantity, and so far as possible, with the exercise of reasonable diligence, the cost price to the seller of each article to be included in the sale, and unless such purchaser shall at least five days before the sale, in good faith, make full and explicit inquiry of the seller as to the names and places of residence or places of business of each and all of the creditors of the seller, and the amount owing each creditor, and unless the purchaser shall at least five days before the sale, in good faith, notify, or cause to be notified, personally or by registered mail, each of the seller's creditors of whom the purchaser has knowledge or can with the exercise of reasonable diligence acquire knowledge, of said proposed sale, and of the said cost price of the merchandise to be sold and of the price proposed to be paid therefor by the purchaser.'' Section 2 makes the violation of the provisions of the first section a misdemeanor, and prescribes a penalty therefor. Under the provisions of this act a sale of any portion or all of a stock of merchandise, made out of the ordinary course of trade, by any merchant who has creditors, without a detailed inventory made at least five days before the sale, showing the cost price of each article, and notice of the proposed sale, the cost price, and selling price, given at least five days before the sale to each creditor, is not only fraudulent and void, but also renders both the seller and purchaser guilty of a misdemeanor, and subjects them to the penalty provided in the act for that crime. Not only this, but the merchant, though ever so solvent and able to pay his debts, must, in order to effect a sale of the whole or any portion of his stock out of the usual course of trade, expose the secrets of his business to every person who may seek to buy and to whom he may desire to sell, as well as to every creditor. The making of inventories and giving notices as required by. the act, it can

readily be seen, would, in many instances, almost absolutely prohibit the consummation of such sales. Such would doubtless be the practical operation of the act in its application to large department stores, where the creditors are numerous, and the stock of merchandise immense. The lapse of time necessarily incident to a compliance with the provisions of the act would have a strong tendency to prevent advantageous sales by the class of 'merchants affected. In many instances it would, doubtless, require many days, or even months, to complete such an inventory and give such notices; and in active business communities purchasers are not likely to look with much favor on such delays. In this age of competition it is quite apparent that this would place such a merchant at a great disadvantage in his struggles to provide for his family—in competing with his neighbor who has no creditors. These same disadvantages would likewise follow the purchaser of the merchandise, in his endeavor to again dispose of the goods if he should happen to be a debtor.

The act appears to be unreasonably restrictive, and is liable to subject individuals to punishment for acts wholly innocent. It seems calculated to inflict upon the seller the loss of an advantageous sale, and cause the purchaser to refrain from making what might to him be an advantageous purchase, because of the risk of delay. It is favorable to one class of merchants and unfavorable to another, and thus places competitors in the same line of business upon different planes. In its operation, as to one class of merchants, it brands as criminals persons perfectly solvent, and abundantly able to discharge their debts and obligations, for making bargains according to customs and usages which have prevailed in the commercial world from time immemorial, while as to the other class the same bargains would be lawful. It holds out advantages to one and denies them to another, both pursuing the same business for a livelihood. As to the debtor class, it prevents a free exchange of lawful commodities, and thus

operates in restraint of trade. Undoubtedly, the Legislature has power to legislate as to the general right of debtors to dispose of their property, and in enacting such legislation the Legislature has the right to consider the debtor's right of disposal of his property by contract or otherwise in connection with the general right of creditors to have afforded an opportunity to collect their claims; but such legislation must not transcend constitutional limitations, or invade the guaranteed rights and liberties of individuals. If within such limitations, such legislation will be upheld, although it be deemed unwise, or, in its operation, unfair and unjust. So the act in question, as we have seen, would evidently, in its general operation, result unjustly and unfairly; yet, if it does not trench upon constitutional law, it can not be held void.

The appellant, however, claims that the enactment interferes with and abridges his inalienable rights, as well as those of others in like situation, subjects of this commonwealth; and for his and their protection against the consequences which naturally flow from such an enactment he appeals to section 1, art. 14, of Amendments to the Constitution of the United States, which, on this subject, provides: "No State shall make or enforce any law which shall abridge the privileges or immunities of citizens of the United States; nor shall any State deprive any person of life, liberty, or property, without due process of law; nor deny to any person within its jurisdiction the equal protection of the laws." For like reasons he appeals to section 1, art. 1, of the Constitution of this State, which *inter alia,* provides: "All men have the inherent and inalienable right to enjoy and defend their lives and liberties; to acquire, possess and protect property; . . . to assemble peaceably, protest against wrongs, and petition for redress of grievances;" and also to section 7 of article 1, which provides: "No person shall be deprived of life, liberty or property, without due process of law." These constitutional provisions constitute the supreme law of the

commonwealth upon this subject.   To that law the exe-
cutive, the legislative, and the judicial departments of
the government alike must bow obedience, as well as
every subject.   It forbids the abridgment by the State
of the.privileges and immunities of all citizens.   Under
its mandate no person can be deprived of life, liberty,
or property without due process of law, and every per-
son is entitled to the equal protection of the laws, and
may acquire property, possess and protect it, as well
as defend his life and liberty.   These are inherent and
inalienable rights of citizens, and are constitutional
guaranties.   An enactment, therefore, which deprives
a person arbitrarily of his property, or of some part of
his personal liberty, is just as much inhibited by the
supreme law as one which would deprive him of life.
And "liberty," in the sense in which the term is here
employed, is not restricted to mere freedom from im-
prisonment, but it embraces the right of a person to use
his God-given powers, employ his faculties, exercise his
judgment in the affairs of life, and to be free in the en-
joyment and disposal of his acquisitions, subject only
to such restraints as are imposed by the law of the land
for the public welfare.   The word "liberty," as
thus employed in the Constitutions and understood
in the United States, is a term of comprehensive
scope.   It embraces not only freedom from servitude
and from imprisonment and arbitrary restraint of per-
son, but also all our religious, civil, political, and per-
sonal rights, including the right in each subject to pur-
chase, hold, and sell or dispose of property in the same
way that his neighbor may; and of such liberties no one
can be deprived except by due process of law.

Property has some essential attributes without
which we could not conceive it to be property.   Among
these are use, enjoyment, susceptibility of purchase,
sale, and of contracts in relation thereto.   The taking
away of any one of the essential attributes may violate
the constitutional guaranty that no person shall be de-
prived of his property without due process of law as

clearly as in case of a physical taking without due process of law.   An enactment, therefore, like the one in controversy, which deprives an owner of his liberty to sell his property, or contract in relation thereto, in the same manner as others engaged in the same business might lawfully do, invades his rights guaranteed by the Constitution, and can not be upheld; and to prevent the free exchange and sale or disposal of property according to the immemorial usages of trade is to deprive it of one of its main attributes.   "The third absolute right, inherent in every Englishman," says Sir William Blackstone in his classification of fundamental rights, "is that of property, which consists in the free use, enjoyment, and disposal of all his acquisitions, without any control or diminution, save only by the laws of the land."   1 Bl. Comm. 138.   The right thus referred to and defined by the illustrious commentator is absolute and inherent in every American, subject of the United States, by virtue of the supreme law of the land.   Therefore, "when a law annihilates the value of property, and strips it of its attributes, by which alone it is distinguished as property, the owner is deprived of it according to the plainest interpretation, and certainly within the spirit of a constitutional provision intended especially to shield private rights from the exercise of arbitrary power."   Wynehamer v. The People, 13 N. Y. 378, 398.   Judge Cooley, in his work on Constitutional Limitations (6th Ed.), 484, speaking of doubtful or questionable legislation, says:   "The doubt might also arise whether a regulation made for any one class of citizens, entirely arbitrary in its character, and restricting their rights, privileges, or legal capacities in a manner before unknown to the law, could be sustained, notwithstanding its generality.   Distinctions in these respects must rest upon some reason upon which they can be defended—like the want of capacity in infants and insane persons; and if the Legislature should undertake to provide that persons following some specified lawful trade or employment should not have capac-

ity to make contracts, or to receive conveyances, or to build such houses as others were allowed to erect, or in any other way to make such use of their property as was permissible to others, it can scarcely be doubted that the act would transcend the due bounds of legislative power, even though no express constitutional provision could be pointed out with which it would come in conflict. To forbid to an individual or a class the right to the acquisition or enjoyment of property in such manner as should be permitted to the community at large would be to deprive them of liberty in particulars of primary importance to their 'pursuit of happiness.' '' In Bank v. Divine Grocery Co., 97 Tenn. 603, 37 S. W. 390, it was said: ''To take from property its chief element of value, and to deny to the citizen the right to use and transfer it in any proper and legitimate manner, is as much depriving him of his property as if the property itself were taken.'' In People v. Otis, 90 N. Y. 48, it was said: ''Depriving an owner of property of one of its essential attributes, is depriving him of his property within the constitutional provisions.'' In State v. Goodwill, 33 W. Va. 179, 10 S. E. 285, 6 L. R. A. 621, 25 Am. St. Rep. 863, it was said: ''The right to use, buy, and sell property, and contract in respect thereto, including contracts for labor—which is, as we have seen, property—is protected by the Constitution. If the Legislature, without any public necessity, has the power to prohibit or restrict the right of contract between private persons in respect to one lawful trade or business, then it may prevent the prosecution of all trades, and regulate all contracts.'' So, in State v. Loomis, 115 Mo. 307, 22 S. W. 350, 21 L. R. A. 789, it was observed: ''Liberty, we have seen, includes the right to acquire property, and that means and includes the right to make and enforce contracts. We do not say that such rights can not be regulated by general law, but we do say that the Legislature can not single out one class of persons who are competent to contract, and deprive them of rights in that respect which are accorded

to other persons.    The constitutional declaration that
no person shall be deprived of life, liberty, or property
without due process of law was designed to protect and
preserve their existing rights against arbitrary legisla-
tion as well as against arbitrary executive and judicial
acts.    The sections of our statute in question deprive a
class of persons of the right to make and enforce ordi-
nary contracts, and they introduce a system of State
paternalism which is at war with the fundamental prin-
ciples of our government, and, as we have before said,
are not due process of law.''    People v. Gillson, 109 N.
Y. 389, 17 N. E. 343, 4 Am. St. Rep. 465, is a case where
the Legislature had passed an act prohibiting the sale
or disposal of any article of food, or any offer or at-
tempt to do so, upon any representation or inducement
that anything else would be delivered as a gift, prize,
premium, or reward to the purchasers, and provided
that any person violating any of its provisions should
be deemed guilty of a misdemeanor.    Mr. Justice Peck-
ham, holding the enactment unconstitutional and void,
in the course of his opinion said:   ''It can not be truth-
fully maintained that this legislation does not seriously
infringe upon the liberty of the owner or dealer in food
products to pursue a lawful calling in a proper manner,
or that it does not, to some extent at least, deprive a
person of his property by curtailing his power of sale;
and unless this infringement and deprivation are rea-
sonably necessary for the common welfare, or may be
said to fairly tend in that direction or to that result, the
legislation is invalid, as plainly violative of the consti-
tutional provision under discussion.''    Again, he said:
''Nor can this act stand as a valid exercise of legislative
power to enact what shall amount to a crime.    The
power of the Legislature to so declare is exceedingly
large, and it is difficult to define its exact limit.    But
that there is a limit even to that power, under our Con-
stitution, we entertain no doubt, and we think that limit
has been reached and passed in the act under review.
The power has been unlawfully exercised in this in-

stance for the same reason that we have already stated —because it violates the constitutional provision which secures to each person in this State his liberty and property, except as he shall be deprived of one or both by due process of law." In Butchers' Union Co. v. Crescent City Co., 111 U. S. 746, 4 Sup. Ct. 652, 28 L. Ed. 585, Mr. Justice Field, speaking of constitutional rights, said: "Among these inalienable rights, as proclaimed in that great document, is the right of men to pursue their happiness, by which is meant the right to pursue any lawful business or vocation in any manner not inconsistent with the equal rights of others, which may increase their prosperity or develop their faculties, so as to give to them their highest enjoyment. The common business and callings of life, the ordinary trades and pursuits, which are innocuous in themselves, and have been followed in all communities from time immemorial, must therefore be free in this country to all alike upon the same conditions. The right to pursue them without let or hindrance, except that which is applied to all persons of the same age, sex, and condition, is a distinguishing privilege of citizens of the United States, and an essential element of that freedom which they claim as their birthright." Matter of Application of Jacobs, 98 N. Y. 98, 50 Am. Rep. 636; City of Clinton v. Phillips, 58 Ill. 102, 11 Am. Rep. 52; State v. Julow, 129 Mo. 163, 31 S. W. 781, 29 L. R. A. 257, 50 Am. St. Rep. 443; Millet v. People, 117 Ill. 294, 7 N. E. 631, 57 Am. Rep. 869; Wally v. Kennedy, 2 Yerg. 554. 24 Am. Dec. 511; People v. Marx, 99 N. Y. 377, 2 N. E. 29, 52 Am. Rep. 34; Yick Wo v. Hopkins, 118 U. S. 356, 6 Sup. Ct. 1064, 30 L. Ed. 220.

Nor can the act be sustained, in its present form, as a proper exercise of the police power of the State, That power, though somewhat shrouded in mystery as to its limits, which are not easy to prescribe with precision, has stood sponsor for multitudes of legislative enactments; but such enactments were nevertheless always bound to be within constitutional limits.

The power, however broad and comprehensive, is not paramount to the Constitution, but is always bounded by its provisions. If, therefore, an act of the Legislature is repugnant to a provision of the Constitution, it can not be held valid as a proper exercise of the police power. Likewise, if a right of property or of person be protected by the Constitution, it can not be destroyed by any exercise of the police power either by the Legislature or the executive power of the State.

Neither the Legislature nor the executive can, under the guise of police regulation or otherwise, arbitrarily or unjustly, without good cause, restrict or infringe upon the property rights or the liberty of any subject within the protection of the supreme law; and whenever the Legislature undertakes to determine what is a proper exercise of police power, its determination is a subject for judicial scrutiny. The power may be exercised to promote the safety, health, comfort, and welfare of society, and to sustain legislation as a proper exercise of the police power it must have reference to some such end. By virtue of that power the use of property is regulated by enforcing the maxim, *"Sic utere tuo ut alienum non laedas."* The enactment in controversy does not appear to have reference to either of the objects here indicated. It can hardly be said that a law which prevents a person, though indebted, who is abundantly able to pay his debts, from selling his property in the same way his neighbors do, and in accordance with a time-honored custom or usage, either promotes the safety, health, comfort, or welfare of the community or the State. If the act referred generally to insolvent debtors it would present a different question; but it relates simply to debtors and purchasers of debtors of a particular and specified business, whether solvent or insolvent; so that the merchant who is worth a fortune over and above his indebtedness, and who is able to respond instantly to his creditors, who may be only such because of con-

27 Utah 26

venience in trade and business transaction, nevertheless finds himself, under the provisions of the act, deprived of the liberty to sell his goods, or to contract in relation thereto in the same manner that others engaged in the same business may lawfully do. Not only this, but by making a sale which would be perfectly lawful if made by his neighbor both he and his purchaser become criminals, and amenable to the penalty provided in the act.

Looking again at the provisions of the enactment, it will be observed that it aims at but one kind of business—the mercantile—and impliedly and arbitrarily divides those engaged therein into two classes. The merchants of the one class being unaffected in their property rights, may make sales and contracts in relation thereto as they see fit; while the same kind of sales and contracts, if made in the same manner by the merchants of the other class, are not only declared void, but will render both the sellers and purchasers liable to criminal prosecution. The enactment, as we have seen, not only places the debtor class in the mercantile business at a great disadvantage in competing with others in the same line of business, but its provisions are exceedingly strict and oppressive. Nor do its provisions apply generally to all debtors within the commonwealth. They apply only to merchants, who are debtors, while farmers, miners, manufacturers, traders, and other dealers, though debtors, may sell and dispose of their property when and as they please so long as they act in good faith. If the act is designed to prevent fraud, why not make it general? Looking alone at the debtor class, there appears to be such a discrimination as is difficult to reconcile with justice and fair dealing. Nor do we perceive any justification for restraining a merchant who is in debt, but solvent, from selling his merchandise, in whole or in part, as he may deem most advantageous, in order to prevent one who is insolvent from exercising the same privilege.

There is another feature which must be deemed quite material in determining the validity or invalidity

of this legislation. Under the terms of the act "a sale of any portion of a stock of merchandise," or "a sale of an entire stock" in bulk, made otherwise than as in the act provided, "is fraudulent and void as against creditors," and renders both the seller and buyer liable to criminal prosecution. Now, it will be noticed that nowhere in its provisions is there an exemption of any sale by administrators, executors, trustees, assignees for the benefit of creditors, trustees in bankruptcy, or public officers acting under judicial process. There being no such exemption, it would seem that such sales of merchandise owned by debtors, made by persons acting in a fiduciary capacity or under judicial process, must also be made in accordance with the provisions of the act, in order that the seller and purchaser may avoid the penalties provided. It is evident that such a law would not only deprive property of one of its chief attributes, but would greatly hamper the administration of estates and retard the enforcing of judicial process. Nor is this law necessary for the public weal. Broad and extensive as the public power of a State is, it can not be assumed that it warrants such legislation as this. It is true, there are extreme cases where the exercise of that power is justified by the maxim, *"Salus populi suprema lex est,"* and so, in some cases of great emergency and overruling necessity, the taking or destruction of property, even without compensation and without due process of law, may be justified; but such is not this case. The police power can never avail to declare an act valid when the Constitution says it is invalid. "The limits to the exercise of the police power can only be this: the regulation must have reference to the comfort, the safety, or the welfare of society; it must not be in conflict with the provisions of the Constitution." Potter's Dwarris on Stat. & Const. 458.

Speaking of the regulation of the conduct of corporations whose charters are inviolable, by the Legislature, under the police power, Judge Cooley says: "The limits to the exercise of the police power in these

cases must be this: The regulations must have reference to the comfort, safety, or welfare of society. They must not be in conflict with any of the provisions of the charter; and they must not, under pretense of regulation, take from the corporation any of the essential rights and privileges which the charter confers. In short, they must be police regulations in fact, and not amendments of the charter in curtailment of the corporate franchise." Const. Lim. (6th Ed.) 710. In Watertown v. Mayo, 109 Mass. 315, 12 Am. Rep. 694, Mr. Justice Colt said: "To a great extent the Legislature is the proper judge of the necessity for the exercise of this restraining power. It is not easy to prescribe its limit. The law will not allow rights of property to be invaded under the guise of a police regulation for the preservation of health or protection against a threatened nuisance; and when it appears that such is not the real object and purpose of the regulation courts will interfere to protect the rights of the citizen." In Matter of Application of Jacobs, 98 N. Y. 98, 50 Am. Rep. 636, Mr. Justice Earl says: "Generally it is for the Legislature to determine what laws and regulations are needed to protect the public health and secure the public comfort and safety; and while its measures are calculated, intended, convenient, and appropriate to accomplish these ends, the exercise of its discretion is not subject to review by the courts. But they must have some relation to these ends. Under the mere guise of police regulations personal rights and private property can not be arbitrarily invaded, and the determination of the Legislature is not final or conclusive. If it passes an act ostensibly for the public health, and thereby destroys or takes away the property of a citizen, or interferes with his personal liberty, then it is for the courts to scrutinize the act, and see whether it really relates to and is convenient and appropriate to promote the public health." Again, referring to the same subject, he says: "Such legislation may invade one class of rights to-day and another to-morrow, and, if it can be

sanctioned under the Constitution, while far removed in time, we will not be far away in practical statesmanship from those ages when governmental prefects supervised the building of houses, the rearing of cattle, the sowing of seed, and the reaping of grain, and governmental ordinances regulated the movements and labor of artisans, the rate of wages, the price of food, the diet and clothing of the people, and a large range of other affairs long since in all civilized lands regarded as outside of governmental functions.     Such governmental interferences disturb the normal adjustments of the social fabric, and usually derange the delicate and complicated machinery of industry, and cause a score of ills while attempting the removal of one.'' In the Slaughter-House Cases, 16 Wall. 36, 87, 21 L. Ed. 394, Mr. Justice Field, referring to the police power of the State, said: ''All sorts of restrictions and burdens are imposed under it, and when these are not in conflict with any constitutional prohibitions or fundamental principles they can not be successfully assailed in a judicial tribunal.  .  .  .  But under the pretense of prescribing a police regulation the State can not be permitted to encroach upon any of the just rights of the citizen which the Constitution intended to secure against abridgment.'' So, in Lawton v. Steele, 152 U. S. 133, 14 Sup. Ct. 499, 38 L. Ed. 385, Mr. Justice Brown said: ''To justify the State in thus interposing its authority in behalf of the public, it must appear, first, that the interests of the public generally, as distinguished from those of a particular class, require such interference; and, second, that the means are reasonable for the accomplishment of the purpose, and not unduly oppressive upon individuals.  The Legislature may not, under the guise of protecting the public interests arbitrarily interfere with private business, or impose unusual and unnecessary restrictions upon lawful occupation.  In other words, its determination as to what is a proper exercise of its police powers is not final or conclusive, but is subject to the supervision of the courts.'' Tiede-

man's Lim. of Police Power, secs. 85, 194; State v. Julow, 129 Mo. 163, 31 S. W. 781, 29 L. R. A. 257, 50 Am. St. Rep. 443; Ex parte Whitwell, 98 Cal. 73, 32 Pac. 870, 19 L. R. A. 727, 35 Am. St. Rep. 152; Austin v. Murray, 16 Pick. 121; Commonwealth v. Alger, 7 Cush. 53, 85; Ex parte Sing Lee, 96 Cal. 354, 31 Pac. 245, 24 L. R. A. 195, 31 Am. St. Rep. 218; Coe v. Schultz, 47 Barb. 64; Lake View v. Rose Hill Cem. Co., 70 Ill. 191, 22 Am. Rep. 71; Bertholf v. O'Reilly, 74 N. Y. 509, 30 Am. Rep. 323; Mugler v. Kansas, 123 U. S. 623, 661, 8 Sup. Ct. 273, 31 L. Ed. 205.

The respondents cite and rely upon several cases from the States of Massachusetts, Maryland, Tennessee, and Washington, where enactments upon the same subject were enforced. While enactments of similar character have been upheld in those States, an examination shows that they all differ materially in important features from the one here under consideration. The law in Massachusetts exempts all sales from its provisions made by officers acting in a fiduciary capacity or under judicial process; and, while it declares a sale made in violation of its provisions fraudulent and void as against creditors, it does not subject the seller and buyer acting in disobedience of the law to criminal prosecution. St. (Mass.) 1903, p. 389, c. 415. Notwithstanding this, however, it seems apparent from the opinion in Squire & Co. v. Tellier et al., (Mass.) 69 N. E. 312, that the Supreme Court of that State regarded their statute as going to the very limit of constitutional authority, when they said: "Although the requirements of the act are very strict, we can not say that the determination of the Legislature, as between the interests of owners of stocks of merchandise and their creditors, was so far wrong as to render the statute unconstitutional." We apprehend, from a perusal of that opinion, that if there, as here, the determination of the Legislature had gone to the length of applying the provisions of the act to persons acting in a fiduciary or official capacity and under judicial process, and provided

criminal punishment for the persons affected if they disobeyed such provisions, the court would have hesitated before pronouncing the act constitutional.

Under the act of the State of Maryland, a sale made in disobedience of the statutory provisions is not absolutely fraudulent and void, as under our enactment, but is simply "presumed to be fraudulent and void as against the creditors of the seller." Laws Md. 1900, p. 907, c. 579. In the case cited from that State the question of the constitutionality of the act was neither presented nor decided. Hart v. Roney, 93 Md. 432, 49 Atl. 661.

So, under the act of Tennessee, a sale made in disobedience of the provisions thereof is only "presumed to be fraudulent and void as against creditors of the seller." Acts Tenn. 1901, p. 234, c. 133. The Supreme Court of Tennessee held the act valid, Mr. Justice Wilkes dissenting. Neas v. Borches, (Tenn.) 71 S. W. 50.

It will be noticed that in none of the acts thus far referred to, except in our own, is disobedience of the provisions thereof by the seller and buyer made a criminal offense. The Supreme Court of Missouri, in State v. Julow, 129 Mo. 163, 31 S. W. 781, 29 L. R. A. 257, 50 Am. St. Rep. 443, determining the validity of an act somewhat similar in character to the one here under consideration, said: "If an owner," etc., "obeys the law on which this prosecution rests, he is thereby deprived of a right and a liberty to contract or terminate a contract as all others may. If he disobeys it, then he is punished for the performance of an act wholly innocent, unless, indeed, the doing of such act guaranteed by the organic law, the exercise of a right of which the Legislature is forbidden to deprive him, can, by that body, be conclusively pronounced criminal. We deny the power of the Legislature to do this—to brand as an offense that which the Constitution designates and declares to be a right, and therefore an innocent act; and consequently we hold that the statute which professes to

exert such a power is nothing more or less than a 'legislative judgment,' and an attempt to deprive all who are included within its terms of a constitutional right without due process of law.''

The provisions of the act of the State of Washington (Sess. Laws 1901, p. 222, c. 109) are so materially different from those of our enactment that the case of McDaniels v. Connelly Shoe Co., 30 Wash. 549, 71 Pac. 37, 60 L. R. A. 947, 94 Am. St. Rep. 889, cited by respondents, as sustaining the statute of that State, can not be regarded as authority herein. Nor, for the reasons given, can any one of the cases, from the several States referred to, be relied upon as controlling authority in this case.

While it is within the province of the Legislature to prevent fraudulent sales as a protection to creditors, still, when it attempts to do this—to remove one evil—it must not so restrict individual rights and disturb industrial pursuits and usages as to cause a score of wrongs.

We are of the opinion that the enactment in controversy abridges some of the inalienable rights of persons guaranteed by the Constitution; that it is not a proper exercise of the police power of the State; that it deprives property of one of its chief attributes, and some persons of the liberty to dispose of property as others may; that it punishes criminally one person for the doing of an act which another person in the same line of business may lawfully do; that it deprives the persons to whom it applies of a right of property without due process of law; and that, therefore, it is null and void.

The judgment must be reversed, with costs, and remanded, with directions to the court below to proceed in accordance herewith. It is so ordered.

BASKIN, C. J., and McCARTY, J., concur.